## Case No. 4,970.

**FOSTER v. GODDARD.**

[1 Cliff. 158.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1858. [2]

## Case No. 4,968.

**FOSTER v. ELLIS et al.**

[5 Ben. 83.] [1]

District Court, E. D. New York. March, 1871.

## Case No. 4,969.

**FOSTER v. GODDARD.**

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

[2] [Affirmed in 1 Black (66 U. S.) 506.]

C. A. Welch, and E. D. Sohier, for complainant.

Watts and Peabody, for respondent.

CLIFFORD, Circuit Justice. Ten exceptions are filed by the respondent to the master's report, which will be considered in the order in which they were made. In the first place, the respondent complains that he was not allowed by the master to debit the assets on hand, under the first contract, with the sums paid by him for clerk hire, taxes upon the property, and for advertising the business. Those expenses amount in the whole, as alleged by the respondent, to the sum of five thousand eight hundred and fifty dollars and sixty-eight cents, and it is insisted by the respondent that the decision of the master on this point was incorrect. Net profit was the basis prescribed by the contract, by which the amount of the complainant's compensation was to be ascertained. If there had been no net profit, then he would have been entitled to no compensation, except the six hundred dollars allowed for his support. As a general rule, the term "net profits" may be defined to be the gain made by the merchant in buying and selling goods after paying all costs and charges for transacting the business, and such it is insisted by the respondent is the sense in which the words are used in this instrument. By the terms of the contract, the complainant was entitled, at the expiration of five years, to one tenth of the net profits of the business in that trade, and by necessary implication the remaining nine tenths of the profits belonged to the respondent. Were this the whole of the contract, it would unquestionably follow, as is contended by the counsel for the respondent, that each of the nine parts of the profits belonging to the respondent ought to be equal to the one tenth part allowed to the complainant. On the part of the complainant it is insisted that the words "net profits," as used in this contract, must be understood in a special sense, and that they mean the gain made in the business after the expenses therein specially enumerated have been deducted. Suppose it to be so for the sake of the argument, it still remains to ascertain whether the charges in question are not properly embraced in the expenses appertaining to the goods themselves, which it is admitted are specially enumerated among those which are to be deducted. Unless clerk hire and expenses for advertising fall within that class of expenditures, it is difficult to see what terms short of the actual enumeration of those expenses could have been employed to accomplish that purpose. Expenses for clerk hire and advertising are as much incident to the transaction of mercantile business as those incurred for insurance, "freight," and storage, and the merchant might as reasonably calculate to procure goods without cost, as to expect to keep them on hand for sale without their being subject to taxation. Interest on capital was, doubtless, enumerated, on account of the special character of the arrangement, to exclude the conclusion that might otherwise follow, that the capital for the business was to be furnished by the respondent without any such allowance, and the same remark applies also to the costs and expenses in victualling, manning, and sailing the vessels employed, and keeping them in repair. Necessary expenses of that sort would arise at home as well as abroad, and hence it was provided that all such expenditures should be deducted from the gross proceeds of the business, in order to ascertain the net profits, to diminishing the usual signification of that term. For these reasons the first exception to the master's report is sustained.

Complaint is made, in the second place, by the respondent, that the master has erroneously charged the business with $1,789.89, being the amount of a loss made in prosecuting the same, for which payment has not been made. Credit had been given to the debtors owing this sum to the amount of $2,173.04 on the sale of a certain quantity of wool; but the amount actually due was in dispute. They tendered to the respondent, in 1850 or 1851, the sum of $1,500, which he declined to receive. Nothing further was done by either party until January, 1857, which was three years after the demand was barred by the statute of limitations. At that time the debtors offered to pay the sum charged by the master to the general account, but the respondent refused to accept it, and also declined to allow the complainant to receive the proportion belonging to him, although

the complainant was present and requested permission so to do. Mere omission to collect, without more, would not render the respondent liable for a claim of this description; but the claim in this case does not rest on that fact alone. He not only suffered the demand to be outlawed, but when the debtors voluntarily came forward after the limitation had taken effect, and offered to' pay nearly the whole amount of the principal, he refused to receive it, and by virtue of his exclusive control over the accounts withheld from the complainant the means to adjust the proportion belonging to him. Suffice it to say on this point, that I am of the opinion that the decision of the master was correct, and for the reasons that he assigned for his conclusion. Both of the preceding exceptions refer to the business transacted under the first agreement, and so does the third, which will now be considered.

It is to the effect that the master has improperly allowed to the complainant one tenth of the profits made by the respondent in the construction and subsequent sale of the vessel called the Valdivia, which he alleges was sold by him for his own benefit. By the terms of the contract, the respondent had the right of purchasing, selling, and chartering the vessels designed for this trade, at his option; and it was expressly stipulated that the loss or profit attendant thereon should be charged or credited in the general account. According to the report of the master, the allegation that this vessel was never employed in the business is technically correct, but she was constructed under a contract made by the respondent, and was in fact built and designed for that purpose, and by the express words of the contract, the interest of the complainant to the full extent of his one tenth was made liable for all the risks and casualties in the business, whether attendant upon the goods or the vessels. As early as the 17th of March, 1846, and before the vessel was constructed, the respondent wrote to the complainant, informing him that he had made the contract for her construction, expressing the hope, at the same time, that she would make the outward passage in sixty-five or seventy days. On the 22d of August, 1846, he wrote again, to the effect that one of the masters employed in the business was waiting for this vessel, adding, in the same letter, that she would be despatched in November. His next letter is dated October 12, 1846, in which he informs the complainant that the vessel would be launched on the following day, saying, "She will be our next ship." In that letter he also informed the complainant that he had engaged a part of her outward cargo, and in a letter dated on the day following he instructed the complainant not to sell anything to arrive by this vessel. During the period covered by this correspondence, and before any intimation had been given by the respondent of any different arrangement, the complainant, on the faith of these letters, had procured a part of her return cargo. Another vessel, however, was sent in her stead, and on the 15th of January, 1847, the respondent wrote to the complainant to the effect that he expected the complainant would be surprised, and perhaps disappointed, in seeing another vessel instead of the new ship, and admitting that he had ·been tempted to sell her for some $9,000 or $10,000 advance above cost. On these facts, and others which need not be reproduced, the master in this case found that the vessel in question was built and designed for this trade, within the meaning of the contract. It appears to the court that the finding is correct, and for the reasons assigned by the master, which need not be repeated. Accordingly the exception is overruled.

In the first account filed by the respondent, he credited the business with the sum of $25,000 received by him, for the sale of the vessel called the Charlotte, and charged commissions on that sum for effecting the sale. That sale was made in February, 1849, as appears by the report of the master. Afterwards he asked to reduce that credit to $16,000, alleging that the last-named sum was the true value of the vessel, on the 3d of October, 1848, when the first agreement expired. His request was denied by the master. To that refusal he objected, and insists in his fourth exception, that, in taking the account, the master has fixed the value of the vessel at a period subsequent to the expiration of the five years mentioned in the contract, whereas it should have been fixed, as he contends, on the 3d of October, 1848, when the five years. from the time of the arrival of the complainant in Valparaiso, expired. When the agreement expired, as is assumed by the respondent, this vessel was at sea upon her fourth return voyage; and it appears, by the report of the master, that she did not arrive in Boston until the 5th of December, 1848. She was not sold until the following February; but the master reports that there was no evidence before him that the value was not about the same at the time of her arrival as at the time of her sale. If any such difference existed, as is supposed. it was certainly incumbent upon the respondent to prove it; and, in the absence of any such proof, it cannot be presumed that mere lapse of time had added anything to the value of the vessel. He gave the credit at the time of sale. and there is no evidence of any mistake or any sufficient reason offered why the correction should be made. On the contrary, it appears, from the report of the master, that he credited one tenth of the profits of the voyage to the respondent, although it did not terminate until two months after the agreement expired. From these facts the master draws the inference, and I think justly, that these transactions were understood and agreed between the parties to be within the first

agreement. For these reasons, as well as those assigned by the master, the fourth exception is overruled.

When the cause was first submitted to the master, he refused to allow the complainant for the profits made in the second voyage of the Crusader, for the reason that those profits were not claimed in the bill of complaint. Subsequently, an amendment to the bill was introduced into the cause, by leave of the court, alleging in substance and effect, that the complainant rendered the same service in relation to that voyage as that rendered by him in relation to the preceding voyages, and that it was well understood and agreed between the parties that this voyage also should be deemed within the original agreement, and that the complainant should be interested therein in the same manner, as if it had been completed within the five years. All these allegations were denied by the answer. In the fifth exception, the respondent complains that the master has allowed the complainant one tenth of the profits of this voyage, insisting, notwithstanding the amendment, that the claim is not embraced in the original or amended bill. Comment upon the objection that the claim is not embraced in the amended bill is unnecessary, as the amendment was introduced into the cause for the very purpose of obviating that difficulty; and its language is as well suited to accomplish the purpose for which it was drawn as could well be chosen. Suffice it to say, that so much of the exception as alleges that the claim is not within the amended bill cannot be sustained. Upon the question of fact put in issue by the pleadings, as amended, the master finds that the respondent requested and received the services of the complainant after the expiration of the five years, and particularly in reference to this voyage; and that the services were rendered by the complainant, with the understanding and agreement between the parties that he was to share in the profits. Such being the state of the facts, the master reported that, under the amended bill, the complainant was entitled to recover one tenth of the profits of this voyage. On an examination of the evidence, the finding of the master appears to be satisfactory, and accordingly the exception is overruled.

It was also contended by the respondent, before the master, that the accounts, under the first agreement, should be made up as cash collected on the day the agreement terminated; and the refusal of the master to adopt that theory constitutes the foundation of the sixth exception. It is to the effect that the master, in taking the account, did not value the assets at the expiration of the five years, but allowed the complainant a portion of the profits after the agreement expired. Claims were still outstanding and uncollected at that time to a large amount; and the respondent proposed and insisted that the master, in making up the accounts,

should deduct the discount necessary to make the debts due equivalent to cash on the day the agreement expired, and calculate interest accordingly. In other words, he contended, and still insists, that the assets, so far as they consisted of unpaid balances, should be valued in the manner suggested as cash on hand; and that thenceforth they were to be regarded as his property, and at his risk. That theory the master declined to adopt, and, as it seems to me, for good reasons which need not be repeated.

Upon the expiration of each contract certain sums were due for goods already sold, and other goods belonging to the joint account were remaining on hand, which were subsequently sold, and the proceeds of both these classes of goods were collected by the house of Alsop & Co. On these sums while they remained in their hands they allowed interest. Remittances were not made by bills of exchange, but the proceeds of the outward adventure were invested in the purchase of return cargoes, and the remittances were made in that way. Interest paid by Alsop & Co., on the funds collected by them on the goods thus circumstanced, was charged by the master in the general account. To that allowance the respondent objected; and it constitutes the essence of his complaint as set forth in his seventh exception. Those funds were clearly at the joint risk, until they were received by the respondent, and no reason is perceived why the complainant is not entitled to his share of the interest accruing on the same. It is clear, therefore, that the seventh exception cannot be sustained.

Another position assumed by the respondent before the master was, that the second agreement terminated on the 1st of April, 1850, when the complainant gave the notice of his intention to withdraw from the business. His letter giving the notice was dated February 22, 1850; but it was not received until the 1st of April following. On the 13th of the same month the respondent replied, approving of the complainant's decision to join the house of Alsop & Co. at the time mentioned in his letter, and promising to comply with the complainant's request for an account as speedily as possible. He made no objection to his withdrawal, or to the time fixed for its accomplishment; and the case shows that the complainant remained and transacted the business as usual, up to the 31st of December, 1850, when he withdrew, and became a member of the house mentioned in his letter. On this state of facts, the master held that the relation between them, under the second agreement, did not terminate before the period when he joined that house. To that finding the respondent objected, and it constitutes the foundation of the eighth exception. It appears to the court that the finding of the master was correct; and the exception is accordingly overruled.

All that need be said concerning the ninth exception is, that it presents the same question, as to the mode of stating the account under the second agreement, as the one involved in the sixth exception, touching the same subject under the first agreement, and must be overruled for the same reasons.

More difficulty arises in disposing of the tenth exception, which is the only one that remains to be considered. It alleges in effect that the master has allowed the complainant one fourth of the profits of the third voyage of the Harriet Erving, which, it is insisted, are not claimed in the bill or the amendments to the same, and that the voyage was not the subject of any agreement between the parties. Some reference to the pleadings, so far as respects the second agreement, becomes necessary, in order that the precise nature of the question presented may be clearly understood. As contended by the respondent, the bill sets up the contract, alleges that the complainant entered upon and conducted the business until December 31, 1850, when the agreement was terminated, by the complainant's giving due notice to the respondent in the manner provided in the contract. In the answer, the agreement is admitted; but the respondent denies that it constituted a partnership, as alleged in the bill. He also admits the complainant's right to withdraw on giving the required notice, and avers that the notice given was received by him on the 1st of April, 1850, and that he acknowledged its receipt, and expressed his satisfaction with the same. No additional agreement was made in respect to this voyage; and if the complainant is entitled to recover this claim at all, he must do so under the pleadings as stated, and the written agreement set up in this part of the bill of complaint. This vessel sailed from Boston, on her outward voyage for Valparaiso, on the 21st of August, 1850, more than four months after the notice had been received by the respondent. She arrived out on the 8th of December, 1850, and sailed thence for Coquimbo on the 27th of the same month. On the 4th of January, 1851, she sailed for Talcahuano, and afterwards, during the same month, for Boston, where she arrived on the 7th of April, 1851. By the terms of the second contract, under which this claim arises, the complainant was entitled to have one fourth part of the net profits of the respondent's business in that trade, which he should have conducted to completion. He was at liberty to withdraw at any time, by giving to the respondent so much notice, that any voyage he had commenced prior thereto should receive the full benefit of the complainant's services to its final accomplishment, and not otherwise. This voyage had not been commenced when the notice was given, nor until more than four months after the respondent received it, and had signified to the complainant his satisfaction at learning the decision to which

he had come. At the time the vessel sailed on her outward voyage, both parties understood that the complainant had complied with the terms of the agreement in giving the notice, and that he was under no obligations arising out of its terms and conditions to transact this business. Beyond question, the reply of the respondent must be understood as an assent to the sufficiency of the notice; and if so, then both parties knew, or ought to have known, that their relations under the second agreement would terminate at the time therein specified. That the complainant so understood it is manifest, not only from the terms of the letter in which he gave the notice, but from his subsequent conduct in joining the house of Alsop & Co. at the time therein designated. It is admitted that the complainant joined the house of Aslop & Co., on the 1st of January, 1851, agreeably to his intention, as expressed in the letter giving the notice, and that he did not go to Coquimbo in this vessel, on the 27th of December, 1850. Another fact is also admitted, of some importance in this investigation, and that is, that the business after the 1st of January, 1851, was transacted by the house of Alsop & Co., and that the new agent of the respondent reached Valparaiso on or about the 1st of November, 1851. As before stated, this vessel arrived at Valparaiso on the 8th of December, 1850. Net sales of the voyage amount in the whole to the sum of $205,620.74, as appears by the record. All of the sales were made by the house of Alsop & Co., who regularly rendered an account of the same to the respondent, for which they charged two per cent. for guaranty, and four and one half per cent. for commissions on sales. Sale of the cargo commenced on the 31st day of December, 1850, as appears by the account of sales, and was continued at different periods down to June 30, 1853. On each and all of these sales they charged the six and one half per cent. commissions, amounting to the sum of $9,736.26. During the whole of the period through which the sales were continued the complainant was a member of that mercantile house, and as such, of course, received his share of those commissions. Whenever he assisted in the business, as appears to the court from the evidence, he acted in virtue of the new relations he had contracted, and not under the agreement with the respondent, which he had previously terminated by the notice. But it is insisted by the complainant that the parties understood their relations otherwise, and that there is evidence in the case sufficient to warrant the conclusion that they had agreed that this voyage should be settled and adjusted within the principles of the written agreement. Suppose it were so, it is not perceived that it would benefit the complainant in this suit, as the difficulty would still remain in all its force, that there is no proper allegation in the bill, or in either of the amendments, to support any such new

agreement. After a careful examination of all the correspondence, I am of the opinion that it does not sustain that view of the case. On the contrary, it appears to me that both parties well understood that their relations, under the written agreement, so far as respects this voyage, had ceased. For these reasons, the tenth exception is sustained, and the accounts must be adjusted so as to conform to the opinion of the court. When that is done, the complainant will be entitled to a decree in his favor. Should any dispute arise in making the adjustment, the cause must be recommitted to the master, to make the necessary corrections.